J-S12042-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
ROY WINDOM :
:
Appellant : No. 1942 EDA 2021

Appeal from the PCRA Order Entered August 30, 2021
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0005594-2017

BEFORE: BENDER, P.J.E., BOWES, J., and DUBOW, J.

MEMORANDUM BY DUBOW, J.: **FILED JULY 11, 2022**

Appellant, Roy Windom, appeals *pro se* from the August 30, 2021 Order, entered in the Philadelphia County Court of Common Pleas, dismissing his Petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541-46. After careful review, we affirm.

We adopt the facts as set forth by the PCRA court. *See* PCRA Ct. Op., 11/9/21, at 1-3. In summary, on May 17, 2017, police arrested Appellant after his younger sister, D.J., reported that Appellant had been physically and sexually abusing her for years. At the time the abuse began, D.J. was 9 years old and Appellant was 24 years old.

The Commonwealth charged Appellant with numerous offenses arising from these allegations. On June 7, 2019, a jury convicted Appellant of Rape of a Child, Unlawful Contact with a Minor, Endangering the Welfare of a Child, and Indecent Assault of a Person Less than 13.

On January 13, 2020, the trial court sentenced Appellant to an aggregate term of 12½ to 25 years of incarceration followed by 12 years of probation. This Court affirmed Appellant's Judgment of Sentence. *Commonwealth v. Windom*, 256 A.3d 31 (Pa. Super. filed May 13, 2021) (unpublished memorandum). Appellant did not seek further review.

On May 7, 2021, Appellant *pro se* filed the instant PCRA petition raising claims that his trial counsel, Richard J. Giuliani, Esquire, had been ineffective by, *inter alia*, failing to investigate the victim's alleged motive to fabricate the allegations against him. Appellant further asserted that his trial counsel was ineffective for failing to object to the Commonwealth's closing arguments, which Appellant characterized as constituting prosecutorial misconduct, and by not ensuring that Appellant was in the courtroom for the presentation of the jury's questions to the court during the jury's deliberation. The PCRA court appointed counsel, who, on June 23, 2021, filed a Letter of No Merit pursuant to *Commonwealth v. Turner*, 544 A.2d 927 (Pa. 1988) and *Commonwealth v. Finley*, 550 A.2d 213 (Pa. Super. 1988) (*en banc*), and a Motion to Withdraw as Counsel.

On July 6, 2021, in response to counsel's "no-merit" letter, Appellant *pro se* filed an Amended PCRA Petition.

On July 29, 2021, the PCRA court notified Appellant of its intent to dismiss his Petition without a hearing pursuant to Pa.R.Crim.P. 907. Appellant did not file a response to the court's Rule 907 Notice.

On August 30, 2021, the PCRA court dismissed Appellant's Petition as meritless.[1] Appellant filed a timely *pro se* appeal from the court's dismissal order and complied with the court's order to file a Pa.R.A.P. 1925(b) Statement. In addition to asserting that the PCRA court had erred in its determination that the issues Appellant raised in his PCRA Petition lacked merit, in the Rule 1925(b) Statement, Appellant also claimed that his PCRA counsel had been ineffective in reaching the same conclusion and in filing a "no-merit" letter. The PCRA court filed a responsive Rule 1925(a) Opinion.

Appellant raises the following issues on appeal:

1. Whether the PCRA court erred in deny[ing] Appellant['s P]etition[?]

2. Whether PCRA counsel was ineffective for filing his no merit letter on the above issues[?]

3. Whether [A]ppellant is entitled to relief[?]

Appellant's Brief at 6.

We review an order denying a petition for collateral relief to determine whether the PCRA court's decision is supported by the evidence of record and free of legal error. *Commonwealth v. Jarosz*, 152 A.3d 344, 350 (Pa. Super. 2016) (citing *Commonwealth v. Fears*, 86 A.3d 795, 803 (Pa. 2014)). "This Court grants great deference to the findings of the PCRA court if the record contains any support for those findings." *Commonwealth v. Anderson*, 995 A.2d 1184, 1189 (Pa. Super. 2010). "Further, the PCRA

---

[1] The PCRA court granted counsel's Motion to Withdraw on September 15, 2021.

court's credibility determinations are binding on this Court, where there is record support for those determinations." *Id.*

To be eligible for relief under the PCRA, a petitioner must establish that his conviction or sentence resulted from one or more of the enumerated errors or defects found in 42 Pa.C.S. § 9543(a)(2): a constitutional violation; ineffective assistance of counsel; an unlawfully induced plea; improper obstruction by governmental officials; a case where exculpatory evidence has been discovered; an illegal sentence has been imposed; or the tribunal conducting the proceeding lacked jurisdiction. *See* 42 Pa.C.S. §§ 9543(a)(2)(i)-(viii). In addition, a petitioner must establish that the issues raised in the PCRA petition have not been previously litigated or waived, and that "the failure to litigate the issue prior to or during trial, during unitary review or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id*. at § 9543(a)(3), (a)(4).

We presume that counsel has rendered effective assistance. ***Commonwealth v. Bickerstaff***, 204 A.3d 988, 992 (Pa. Super. 2019). In order to overcome the presumption that counsel has provided effective assistance, a petitioner must establish that: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable basis for his act or omission; and (3) petitioner suffered actual prejudice. ***Commonwealth v. Bradley***, 261 A.3d 381, 390 (Pa. 2021). A petitioner must plead and prove by a preponderance of the evidence each of these elements. 42 Pa.C.S. § 9543(a). A claim will be denied if the petitioner fails to meet any one of these prongs.

*See Jarosz*, 152 A.3d at 350 (citing *Commonwealth v. Daniels*, 963 A.2d 409, 419 (Pa. 2009)).

In his Brief, Appellant argues that his PCRA counsel was ineffective for filing a "no-merit" letter because his underlying claims of trial counsel's ineffectiveness are meritorious.[2] In particular, Appellant emphasizes the meritoriousness of the claims he raised in his PCRA Petition, *i.e.*, that his trial counsel was ineffective for not objecting to the Commonwealth's statements during closing argument, which he characterizes as prosecutorial misconduct, and for not insisting that Appellant be present in the courtroom during the presentation of the jury's questions to the court.

The Honorable Timika R. Lane, who presided over Appellant's trial and PCRA proceedings, has authored a comprehensive, thorough, and well-reasoned opinion, citing to the record and relevant case law in addressing Appellant's challenge to the effectiveness of both his PCRA and trial counsel. After a careful review of the parties' arguments and the record, we affirm on the basis of the PCRA court's Opinion. *See* PCRA Ct. Op at 7-15 (concluding that Appellant's claims of ineffective assistance of trial counsel lacked merit because: (1) Appellant's trial counsel had no reasonable basis to object to statements made by the Commonwealth during closing arguments as the

---

[2] Although issues not raised within a PCRA petition may generally not be raised for the first time on appeal, in *Commonwealth v. Bradley*, 261 A.3d 381 (Pa. 2021), our Supreme Court held that a "PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal."

statements were "derived directly from the evidence presented at trial"; (2) the Commonwealth's statements did not constitute prosecutorial misconduct for the same reason; and (3) Appellant was present when the trial court addressed the jury's questions, and that because Appellant's claims of trial counsel's ineffectiveness lacked merit, PCRA counsel was not ineffective for filing a "no-merit" letter).

Order affirmed. The parties are instructed to attach a copy of the PCRA court's November 9, 2021 Opinion to all future filings.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/11/2022

FILED

NOV - 9 2021

Office of Judicial Records
Appeals/Post Trial

## IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## TRIAL DIVISION – CRIMINAL SECTION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0005594-2017 |
| | : | |
| v. | : | |
| | : | |
| ROY WINDOM | : | 1942 EDA 2021 |

## OPINION

Lane, J.                                                                   November 9, 2021

### OVERVIEW AND FACTS

Roy Windom ("Appellant") appeals *pro se* from this court's order dismissing his petition filed under the Post Conviction Relief Act.[1] For the reasons discussed below, no relief is due.

Appellant's convictions stem from his protracted physical and sexual abuse of his younger sister, D.J. The abuse began when D.J. was nine years old and continued until she was thirteen. (N.T. 6/5/19 at 42, 61). At trial, D.J. testified to the following facts.

D.J. grew up and lived in Philadelphia with her mother (T. Lyons, herein "Lyons"), Appellant, her younger brother ("J.J."), and two of Lyons's grandchildren. (Id. at 40, 113–14). The home had three bedrooms on the second floor. (Id. at 41). D.J. and J.J. each had their own room (Id.); Lyons occupied the third bedroom, which she typically shared with her grandchildren; and Appellant, who did not have a bedroom, slept downstairs on the couch. (Id. at 41, 115).

---

[1] 42 Pa.C.S.A. § 9541 *et. seq.*

1

Occasionally, D.J.'s sisters visited Lyons's home and stayed in D.J.'s room, but D.J. generally did not share her room with anyone. (Id. at 41, 63, 115).

D.J. testified that when she was seven years old, Appellant started to physically abuse several members of her household. (Id. at 42, 117–18). Both D.J. and Lyons testified that Appellant frequently "hit" Lyons, D.J., and D.J.'s siblings. (Id. at 45, 117–18). Lyons further testified that Appellant often had violent fits of rage and that the members of her household were "afraid" of him. (Id. at 124, 126).

D.J. also described several incidents of sexual abuse by Appellant. One night when D.J. was nine years old, he entered the minor's bedroom and touched her breasts and "private area" under her clothes. (N.T. 6/5/19 at 43). Appellant digitally penetrated D.J.'s vagina and moved his fingers in a "circular" motion. (Id. at 43–44). He then engaged in vaginal intercourse with D.J., which caused her to bleed and feel pain. (Id. at 44). Appellant abused D.J. in a similar fashion on several occasions. (Id. at 45). D.J. explained that Appellant typically positioned her on her "back or [her] side," and that the abuse always occurred in her bedroom. (Id. at 57, 45). D.J. further testified that Appellant threatened to hurt their mother if D.J. ever disclosed his misconduct. (Id. at 45). D.J. took Appellant's words as a "valid threat," and she was effectively deterred from telling anyone about the abuse. (Id. at 45–46, 56).

When D.J. was eleven or twelve years old, the family moved to a different home in Philadelphia, where Appellant continued to vaginally rape D.J. on a regular basis. (N.T. 6/5/19 at 46, 50). The last incident occurred at some point in 2014, when D.J. was thirteen years old. (Id. at 61, 68). Appellant became intoxicated and instigated a physical fight with Lyons. (Id. at 49). Following the altercation, Appellant went to D.J.'s bedroom. (Id.). When the child saw him, she started to cry and told him "no." (Id. at 49–50). Appellant laid on D.J.'s bed as she repeatedly hit

2

him and tried to push him away. (Id. at 50). Despite her efforts, Appellant held her hands "back" and forced her to engage in vaginal intercourse. (Id. at 47–51).

The following morning before D.J. went to school, Appellant violently attacked D.J., Lyons, and J.J. (Id. at 47). During his outburst, Appellant punched D.J. in her face, which caused her to sustain a black eye.[2] (Id. at 47, 66). D.J. disclosed Appellant's violent behavior to her school principal, who contacted the Department of Human Services ("DHS"). (Id. at 51–52, 66, 69). D.J. did not disclose any details of Appellant's sexual malfeasance on that date. (Id. at 47, 66). That same day, DHS removed D.J. and J.J. from Lyons' home (Id. at 51–52), and the two children were later placed in their father's care in Delaware. (Id. at 69–70); (Comm. Ex. 4 at 6).

On August 25, 2014, D.J. disclosed aspects of Appellant's sexual abuse to healthcare professionals at Children's Hospital of Philadelphia. (N.T. 6/5/19 at 53–54); (Comm. Ex. 4 at 3, 9). On that same date, Officer Timothy McIntyre from the Special Victims Unit authored a report and referred the case to Philadelphia Children's Alliance ("PCA"). (Comm. Ex. 3 at 2). PCA conducted interviews on October 29, 2014 and November 19, 2015, wherein D.J. disclosed various instances of sexual abuse by Appellant. (N.T. 6/5/19 at 54–57); (Comm. Exs. 2, 3). Following these interviews, the case was again referred to the SVU, where Officer Tyrone Green investigation the allegations and authored a corresponding report. (N.T. 6/5/19 at 165); (Comm. Ex. 6 at 1). Appellant was eventually arrested on May 17, 2017. (Comm. Ex. 7 at 1).

---

[2] D.J. explicitly testified that Appellant blacked her eye in February of 2015 (N.T. 6/5/19 at 68). However, the record as a whole establishes that this particular incident occurred at some point before D.J.'s October 29, 2014 DHS interview. See (N.T. 6/5/19 at 66); (Comm. Ex. 3 at 2) ("Per initial referral information, in June 2014, [D.J.] was living with [her] mom . . . and [Appellant] . . . and was punched in the face by [Appellant][.]"); (Comm. Ex. 4 at 9) ("[D.J.] reports that in June, her 27 yo brother punched her in the eye and DHS sent her and her 11 yo b[r]other to live with her father in DE.").

3

# PROCEDURAL HISTORY

Based on the aforementioned facts, on June 7, 2019, a jury found Appellant guilty of rape of a child, unlawful contact with a minor, endangering the welfare of a child ("EWOC"), and indecent assault of a person less than thirteen.[3] Appellant filed a *pro se* interlocutory appeal on June 15, 2019, which the Superior Court quashed on September 24, 2019.[4]

On January 13, 2020, this court sentenced Appellant to an aggregate 12½ to 25 years' incarceration, followed by 12 years of probation. This court sentenced Appellant to 10 to 20 years' imprisonment for rape of a child and a consecutive 2½ to 5 years' imprisonment for EWOC, followed by 7 years' probation for unlawful contact with a minor and a consecutive 5 years' probation for indecent assault. Appellant was further ordered to undergo sex offender treatment, mental health treatment, and to comply with all Tier III registration and notification requirements under SORNA.

Appellant filed a second notice of appeal on February 11, 2020. On March 9, 2020, Appellant timely submitted a Pa.R.A.P. 1925(b) statement challenging, *inter alia*, the discretionary aspects of his sentence. This court issued an opinion on November 9, 2020, finding that Appellant was not entitled to relief. The Superior Court agreed and affirmed the judgment of sentence on April 15, 2021. Commonwealth v. Windom, No. 607 EDA 2020, 2021 WL 1424245 (Pa. Super. Ct. Apr. 15, 2021), opinion withdrawn (Apr. 19, 2021), superseded sub nom. Commonwealth v. Windom, 256 A.3d 31 (Pa. Super. Ct. 2021) (unpublished disposition). However, on April 19, 2021, the Superior Court withdrew its original memorandum and issued a new memorandum on May 13, 2021, stating, "[W]e discern no abuse of discretion in the trial court's sentence, and we

---

[3] 18 Pa.C.S.A. § 3121(c), 18 Pa.C.S.A. § 6318(a)(1), 18 Pa.C.S.A. § 4304(a)(1), and 18 Pa.C.S.A. § 3126(a)(7), respectively.
[4] See Superior Court Order 1732 EDA 2019.

4

decline to disturb it. Therefore, we find that Windom's appeal merits no relief." Windom, 256 A.3d 31. Appellant did not seek discretionary review with the Supreme Court of Pennsylvania.

In the interim, on May 7, 2021, Appellant filed a *pro se* PCRA petition.[5] Stephen O'Hanlon, Esquire entered his appearance on Appellant's behalf on May 25, 2021. On June 23, 2021, Attorney O'Hanlon filed a "no merit" Finley[6] letter, wherein he addressed fifteen discrete issues asserted within Appellant's *pro se* petition. Upon counsel's review, he determined, "[Appellant] is not entitled to relief because [his] claims are without merit[,] and [Appellant] cannot show prejudice relating to prior counsel's performance." On July 6, 2021, Appellant filed a *pro se* amended petition entitled "Issues to be Asserted on Appeal," in response to counsel's Finley letter.

On July 29, 2021, this court issued an order informing Appellant that his petition would be summarily dismissed, pursuant to Pa.R.Crim.P. 907, and Appellant's petition was formally dismissed on August 30, 2021. Attorney O'Hanlon was permitted to withdraw.

On September 9, 2021, Appellant filed the instant *pro se* notice of appeal. This court ordered Appellant to file a 1925(b) statement on September 15, 2021. On September 29, 2021, Appellant filed a "Tentative and Preliminary concise statements' of matters complained of on

---

[5] Notably, Appellant filed his PCRA petition on May 7, 2021—before the Superior Court issued its second memorandum on May 13, 2021. It is well settled that "[a] PCRA petition may only be filed after an appellant has waived or exhausted his direct appeal rights." Commonwealth v. Smith, 244 A.3d 13, 16 (2020). Moreover, "[i]f a petition is filed while a direct appeal is pending, the PCRA court should dismiss it without prejudice towards the petitioner's right to file a petition once his direct appeal rights have been exhausted." Id. at 16–17. However, this court determined that Appellant's petition was **not** improperly filed during the pendency of direct appeal, as the Superior Court had already affirmed Appellant's judgment of sentence in its initial memorandum on April 15, 2021, and Appellant did not seek discretionary review with the Supreme Court of Pennsylvania. See Superior Court Docket No. 607 EDA 2020 at 4.
[6] Commonwealth v. Finley, 550 A.2d 213, (Pa. Super. 1988).

appeal." He filed a nearly identical,[7] amended 1925(b) statement on October 1, 2021, raising the following issues:

1. PCRA counsel was ineffective for determining [A]ppellant[']s claims raised in his *pro se* PCRA petition were without merit. With special attention to the claims of prosecutorial misconduct in the Commonwealth[']s closing arguments, trial counsel[']s failure to object to the Commonwealth[']s closing arguments. [See N.T. 6/6/19 at 43, 50–53]. As well as the claim involving not having [A]ppellant present during the jury question ([A]ppellant understands the court position on this issue but being this was a pivotal moment in [A]ppellant[']s trial[,] PCRA counsel could have amended this to better suit a claim on trial counsel[']s failure to act). Both the record and the evidence support these claims so [A]ppellant request[s] to present[] the following questions to this court:
   a. Do these claims contain arguable merit proving PCRA counsel did not conduct an extensive review?

   b. Is [A]ppellant entitled to relief or remand for further review on the merits of these claims?

   c. Did PCRA counsel[']s decision to file a no-merit letter on these claims deny [A]ppellant an opportunity at a meaningful review?

   d. Did the accumulation of these errors deny [A]ppellant a fair trial combined with the later claim of trial counsel[']s failure to conduct a thorough investigation?

2. PCRA counsel was ineffective for not communicating issues with [A]ppellant[']s claims raised in his PCRA petition, or requesting other forms of supporting information or documentation such as the PCA reports (which [A]ppellant believes PCRA counsel could not have based on some of his conclusions). Prior to filing his Turner/Finley letter denying [A]ppellant a chance at a meaningful review.

3. PCRA counsel was ineffective for determining [A]ppellant's claims of trial counsel[']s failure to conduct a proper a[nd] thorough investigation of the following dates are without merit: 10-1-14, 10-2-14, 10-6-14, 10-29-15, 11-18-15, 11-19-15, this also includes claims involving the in camera hearing involving the psychiatric reports from 11-19-15 and the correspondence that accompanied the original PCRA petition. In addition[,] trial counsel[']s failure to investigate the motive behind the 2015 and 2014 allegations.

---

[7] Appellant's 1925(b) statements are identical in nearly every aspect. However, the amended statement includes (1) specific citations to the record that supplement Appellant's claim relating to the Commonwealth's closing statements and (2) a corrected date relating to Appellant's third claim. This court's opinion solely references Appellant's amended 1925(b) statement.

4. PCRA counsel was ineffective for not communicating the need for more information to further the claims involving trial counsel's deletions of evidence in the form of text messages prior to trial. Denying [A]ppellant the ability to produce rebuttal evidence, and exculpatory evidence as well as character evidence for review.

5. Did the PCRA court err in denying [A]ppellant[']s PCRA petition after [A]ppellant made the court aware of issues involving communication and the lack of available information in the form of the PCA reports for PCRA counsel to make an adequate decision in filing his no-merit letter.

6. Did the PCRA court err in denying [A]ppellant's PCRA petition after making the court aware of issues, which involved trial counsel deleting the text messages and violating the Rules of Professional Conduct?

(Am. 1925(b) Statement) (unnecessary capitalization omitted) (some formatting altered).

## DISCUSSION

As an initial matter, issues that are not raised within a PCRA petition generally may not be raised for the first time on appeal. Commonwealth v. Santiago, 855 A.2d 682, 691 (Pa. Super. 2004) ("We have stressed that a claim not raised in a PCRA petition cannot be raised for the first time on appeal."). Prior to the Supreme Court of Pennsylvania's ruling in Commonwealth v. Bradley, this rule applied equally to PCRA appeals where a *pro se* petitioner-appellant claimed (for the first time on appeal) that PCRA counsel was ineffective. No. 37 EAP 2020, 2021 WL 4877232 (Pa. Oct. 20, 2021). However, our Supreme Court recently held that a "PCRA petitioner may, after a PCRA court denies relief, and after obtaining new counsel or acting *pro se*, raise claims of PCRA counsel's ineffectiveness at the first opportunity to do so, even if on appeal." Id.

Here, Appellant raises allegations of ineffectiveness against PCRA counsel for the first time on appeal. Under Bradley, Appellant's claims against PCRA counsel are ripe for appellate review, despite being debuted for the first time in his 1925(b) statement. Nonetheless, Appellant is not entitled to PCRA relief, and this court's order dismissing his petition should be affirmed.

7

In reviewing a PCRA court's dismissal of a petition, the standard of review is well settled: "The standard of review of an order dismissing a PCRA petition is whether that determination is supported by the evidence of record and is free of legal error. The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." Commonwealth v. Williams, 244 A.3d 1281, 1286–87 (Pa. Super. 2021) (citation omitted).

Moreover, a PCRA court may dismiss a petition without a hearing if the petition raises no genuine issue of material fact and no legitimate purpose would be served by further proceedings. Commonwealth v. Barbosa, 819 A.2d 81, 85 (Pa. Super. 2003) (citing Pa.R.Crim.P. 907). "To obtain reversal of a PCRA court's decision to dismiss a petition without a hearing, an appellant must show that he raised a genuine issue of fact which, if resolved in his favor, would have entitled him to relief, or that the court otherwise abused its discretion in denying a hearing." Commonwealth v. Blakeney, 108 A.3d 739, 750 (Pa. 2014) (citation omitted).

To be eligible for PCRA relief under a theory of ineffective assistance of counsel, a petitioner must establish that counsel's ineffectiveness "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." Commonwealth v. Johnson, 966 A.2d 523, 532 (Pa. 2009) (quoting 42 Pa.C.S.A. § 9543(a)(2)(ii)). Counsel is presumed to have rendered effective assistance, and the petitioner has the burden of proving otherwise. Id. A petitioner can only satisfy his burden by pleading and proving **each** of the following elements by a preponderance of the evidence: (1) the underlying claim has arguable merit, (2) the strategic tactics employed by counsel had no reasonable basis designed to effectuate the petitioner's interest, and (3) the petitioner suffered actual prejudice, and, but for counsel's act or omission, the outcome of the proceeding likely would have been different.[8] Id. at 532–33. The

---

[8] "The three-factor approach utilized in Pennsylvania derives from our application in Commonwealth v. Pierce, 515 Pa. 153, 527 A.2d 973, 975 (1987), of the 'performance and prejudice' test articulated by the United States Supreme

ineffectiveness test is conjunctive; if a petitioner fails to satisfy a single prong, his ineffectiveness claim will fail. Commonwealth v. Martin, 5 A.3d 177, 183 (Pa. 2010). Finally, "a claim of **PCRA counsel's** ineffectiveness is subject to the traditional test of ineffective assistance set forth above." Commonwealth v. Lauro, 819 A.2d 100, 109 (Pa. Super. 2003) (emphasis added).

## I. PCRA counsel was not ineffective for concluding that Appellant's pro se claims lacked merit.

In his first issue on appeal, Appellant argues that trial counsel was ineffective by (a) failing to object to the Commonwealth's closing arguments and (b) failing to ensure that Appellant was "present during the jury question." (Am. 1925(b) Statement at 1; see also, PCRA Pet. at 13, 18–19, 27).[9] He further claims **PCRA counsel** was ineffective for determining that these claims lack merit.

Appellant is not entitled to relief. His underlying issues relating to the Commonwealth's closing remarks and his presence during jury questions are contradicted by the record. Thus, neither trial counsel nor PCRA counsel may be deemed ineffective on either basis.

### a. Trial counsel was not ineffective for failing to object to the Commonwealth's closing arguments.

By way of background, Appellant testified that he and Lyons had a "dispute" in October of 2015, and Lyons lost her job a "couple of weeks later." (N.T. 6/5/19 at 187–88, 191–93). According to Appellant, D.J. learned of the dispute when Lyons visited her at The Bridge[10] on November 18, 2015. (PCRA Pet. at 13, 27). Throughout his PCRA petition, Appellant fervently

---

Court in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)." Commonwealth v. Dennis, 950 A.2d 945, 954 (Pa. 2008).

[9] Appellant's PCRA petition has been repaginated for clarity. See Trial Court Attachment A.

[10] According to the November 19, 2015 PCA interview summary, D.J. had been "in DHS's care and inpatient at The Bridge . . . . since June of 2015." (Comm. Ex. 2 at 1, 3). The Bridge is "a nonprofit behavioral health treatment and youth opportunity program for adolescents and their families seeking to overcome substance abuse, mental health issues, truancy and other challenges." *Mission & Overview*, THE BRIDGE, https://thebridge.phmc.org/mission-a-overview (last visited Nov. 3, 2021).

9

highlights the fact that Lyons's visit occurred just one day before D.J.'s November 19 PCA interview, during which she reported that Appellant "sexually abused" her and "put his private between her legs." (PCRA Pet. at 13, 27; Comm. Ex. 2 at 2). Appellant theorizes, "[D.J.] was angered over her mother losing her job and became overwhelmed with the situation and held me responsible. I believe because of this she made the allegations." (PCRA Pet. at 9–10, 13; see also, Am. PCRA Pet. at 13–14, 16).

During closing arguments, the Commonwealth mentioned Appellant's theory "that the mom made it up to get back at [him]" and countered, "[r]emember where [D.J.] was when she made that allegation, when she finally told her story. She was at [T]he Bridge, she didn't have contact with the mom." (N.T. 6/6/19 at 43). The prosecutor elaborated on this argument with the following remarks, each of which Appellant challenges on appeal:

> Now, there are some important things about that because there's been through the defendant's testimony and through the argument there's been some allegations that the mom made it up to get back at Mr. Windom. Remember where she was when she made that allegation, when she finally told her story. She was at [T]he Bridge, she didn't have contact with the mom. She's taken immediately to the Philadelphia Children's Alliance, and she tells what happened to her. There's no way that she's told what to say.
>
> . . . .
>
> Now he tells you that there is something going on with [T.] Lyons, and that's the reason this is up, right, that this is revenge, that [T.] Lyons stole from him, something happened, it was getting resolved, and she's after him. He says it was resolved on the 18[th] of November, and all of a sudden when this has happened on the 19[th] of November, there's your timeline for you, right? Amazing because again remember [T.] Lyons didn't have access to [D.J.], didn't find somehow on the 18[th] and say, hey, you better go make this report, let's get him in trouble. [D.J.] is in the Bridge, away from the mom, in therapy. But [Appellant] got to shape his story because he knows it was disclosed on the 19[th], and I'll come up with something on the 18[th] that gives a reason for it, no evidence of that besides his testimony. So where does that leave us?
>
> Very interesting and Mr. Windom noted it on the stand. He makes his accusation. Now [T.] Lyons testified on the stand, and you saw the cross-

10

examination by the defense attorney, [Appellant]'s attorney. He wasn't gentle with [T.] Lyons. He was aggressive as he's allowed to be. He pressed her on many issues. Not once did he ask her about that. He didn't say, now did you steal from [Appellant]? He didn't mention that because it didn't happen and he knew what her answer would be. He can't trap in something that didn't happen, so he didn't ask about it.

He had [D.J.] on the stand and he was pressing that young woman, as is his right to do. He cross-examined her on many, many issues. Did he say, Did your mom steal from him? Did your mom put you up to this and tell you to make something up to get him in trouble and get revenge? No, he didn't ask her any questions about that. He asked lots of questions, forceful but he didn't ask her questions about that because it didn't happen and he knew what the answer would be, so it doesn't give him an opportunity to address it, and then [Appellant] gets on the stand and says, by the way, my mom stole from me. It was resolved on the 18th of November. Then she got back at me on the 19th. It doesn't make any sense.

The Commonwealth will submit it was untruthful and you should weigh that against bias. Again, [Appellant] is not going to admit he did it, but ladies and gentlemen, the evidence shows he did do it.

(N.T. 6/6/19 at 43, 50–53).

Appellant argues that the prosecutor's statements constitute "prosecutorial misconduct," as the statements are "untrue according to the evidence on record," "improper," and "did not relate back to the evidence." (PCRA Pet. at 13, 19, 27). On appeal, Appellant derivatively claims that trial counsel was ineffective for failing to object to these remarks, and PCRA counsel was ineffective for determining that trial counsel was **not** ineffective. (Am. 1925(b) Statement at ¶ 1). However, as the Commonwealth's statements are clearly supported by the evidence, Appellant's underlying claim has no merit. Thus, both ineffectiveness claims must fail.

It is well settled that prosecutors "must have reasonable latitude in presenting a case to the jury, and must be free to present arguments with logical force and vigor." Commonwealth v. Chamberlain, 30 A.3d 381, 408 (Pa. 2011) (citation omitted). During closing arguments, prosecutors may "argue all reasonable inferences from the evidence in the record" and "respond fairly to arguments made in the defense closing argument." Commonwealth v. Clancy, 192 A.3d

11

44, 62 (Pa. 2018). Moreover, Pennsylvania Rules of Professional Conduct "simultaneously impose heightened ethical obligations upon prosecutors, while recognizing that prosecutors nonetheless function as **advocates for the Commonwealth.**" Id. (emphasis added). As part of a prosecutor's role as an advocate, he or she may argue that the **evidence** establishes the accused's guilt. Chamberlain, 30 A.3d at 408. Consequently, "the underlying issues and elements at trial dictate the bounds of permissible argument." Clancy, 192 A.3d at 62.

Applying these principles, the Supreme Court of Pennsylvania utilizes the following two-part test to evaluate a prosecutor's closing statements: "[W]e have required Pennsylvania courts to evaluate both the substance of the challenged remark and its effect upon the jury." Id. Further,

> [t]he substance prong requires a court to examine the challenged remark in the context of the issues presented at trial. The court first must determine whether the remark reasonably relates to the facts of the case. A statement is impermissible where the language and inferences of the summation no longer relate back to the evidence on the record. Upon finding that the statement at issue has a reasonable evidentiary foundation, the court next must determine whether the statement facilitates "the trier's duty to decide the case on the evidence. **The remark not only must be based upon the evidence; it also must bear relevance to the crimes at issue.** Merely derogatory, ad hominem characterizations of the defendant or defense counsel are beyond the bounds of permissible advocacy; the prosecutor's comments must be tethered to the elements of the charged offenses and the evidence offered to prove those elements, and also should be tailored to a fair and reasonable rebuttal of the arguments advanced by the defense.

Id. at 62–63 (emphasis added) (internal citations and quotation marks omitted).

Finally, even if a prosecutor's statements are improper, they "do not amount to reversible error unless the 'unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict.'" Chamberlain, 30 A.3d at 408 (citing Commonwealth v. D'Amato, 526 A.2d 300, 309 (Pa. 1987)).

12

Here, contrary to Appellant's claim, the Commonwealth's closing remarks were derived directly from the evidence presented at trial. D.J.'s November 19, 2015 PCA summary indicates that D.J. had been "in DHS's care and inpatient at The Bridge" since June of 2015. (Comm. Ex. 2 at 1, 3; see also, N.T. 6/5/19 at 156–61). The report further indicates that about "**one month**" before D.J.'s November 19 interview, she "started disclosing about the current allegations . . . and recently ha[d] started becoming more descriptive."[11] (Comm. Ex. 2 at 3). Finally, the report notes, "[D.J.] saw [Lyons] for the **first time** in a long time yesterday (11/18/15)." (Comm. Ex. 2 at 4) (emphasis added).

Accordingly, even if D.J. had learned of Appellant's and Lyons's "dispute" one day before her PCA interview, it does not follow that the dispute prompted her to fabricate allegations against Appellant (as he repeatedly asserts in his PCRA petitions). (See PCRA Pet. at 9–10, 13; Am. PCRA Pet. at 13–14, 16). The evidence plainly establishes that D.J. had been slowly disclosing aspects of the underlying abuse for "approximately one month" **before** she supposedly learned about the issue between Appellant and Lyons. (Comm. Ex. 2 at 3). Thus, Appellant's stated grievance with the Commonwealth's closing arguments—i.e., that they were "untrue according to the evidence on record"—is simply incorrect.

Moreover, the Commonwealth's remarks did not include ad hominem attacks, improper personal opinions about Appellant's guilt, or any statement that created "fixed bias and hostility" toward Appellant. See Chamberlain, 30 A.3d at 408. Rather, the statements were a perfectly fair rebuttal to Appellant's testimony. Thus, trial counsel had no reasonable basis on which to lodge an objection, and Appellant's ineffectiveness claims must fail.

---

[11] Carolina Castano, a forensic interviewer from PCA, testified that child complainants "typically" disclose sexual abuse "in a very gradual nature which is they tell a little bit at first, see how people react, then tell a little bit more." (N.T. 6/5/19 at 160).

13

**b. Appellant was present when this court addressed the jury questions; thus, his claim fails.**

In his next claim, Appellant alleges that he was not present "during the jury questions." (Am. 1925(b) Statement at ¶ 1). He further claims that trial counsel was ineffective for failing to lodge an objection on this ground, and PCRA was ineffective for concluding that the claim lacks merit. As this allegation is based on a misstatement of fact, no relief is due.

The Confrontation Clause of the Sixth Amendment and in the Due Process Clauses of the Fifth and Fourteenth Amendments provide a criminal defendant with the right to be present at his or her trial. Commonwealth v. Hunsberger, 58 A.3d 32, 37 (Pa. 2012) (citation omitted). Moreover,

> the High Court "has assumed that, even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge. Thus, a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure.

Id. (ellipsis omitted) (citation omitted).

Pennsylvania Rule of Criminal Procedure 602(A) further provides, "[t]he defendant shall be present at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence." Pa.R.Crim.P. 602(A). A defendant's right to be present at "every stage" of his trial includes a right to be present during a trial court's ruling(s) on questions from the jury. See Commonwealth v. Williams, 959 A.2d 1272, 1282–83 (Pa. Super. 2008) (concluding that the trial court violated Rule 602(A) in ruling on the jury's request to review an exhibit where the defendant was not present).

Here, the jury began deliberation on June 6, 2019 at 11:49 a.m. (N.T. 6/6/19 at 80). At some point, the jury submitted two questions: "Question No. 1. Can we see the PFA report No. 2 from November 15. . . . Question No. 2. We are close to reaching an agreement, but not all people

14

are in agreement." (N.T. 6/7/19 at 4). This court could not immediately rule on the jury's questions, as this court was sitting for an unrelated matter. (Id.).

By the time the questions were presented to this court on June 7, 2019, the parties had "agree[d] to tell [the jury] to rely on their own recollection," and the jury had already arrived at a unanimous verdict. (Id. at 4–10). Thus, the jury questions were never ruled upon, either within or outside of Appellant's presence. Moreover, Appellant **was present** when this court read the jury's questions aloud in open court. (Id. at 4–5). Accordingly, Appellant's claim that he was not "present during the jury question" has no merit, and neither trial counsel nor PCRA counsel may be deemed ineffective on this ground.

## II.    Appellant's remaining claims are waived for lack of specificity.

Each of Appellant's remaining claims is too imprecise to enable meaningful review. Thus, the remaining issues are waived.

Pennsylvania Rules of Appellate Procedure require a 1925(b) statement to "concisely identify each error that the appellant intends to assert with sufficient detail to identify the issue to be raised for the judge." Pa.R.A.P. 1925(b)(4)(ii). It is well settled that a statement "which is too vague to allow the court to identify the issues raised on appeal is the functional equivalent of no Concise Statement at all." Commonwealth v. Reeves, 907 A.2d 1, 2 (Pa. Super. 2006) (citation omitted). The trial court's "review and legal analysis can be fatally impaired when the court has to guess at the issues raised. Thus, if a concise statement is too vague, the court may find waiver." Commonwealth v. Scott, 212 A.3d 1094, 1112 (Pa. Super. 2019) (citation omitted), appeal denied, 222 A.3d 383 (Pa. 2019). Further, a litigant appealing the denial of PCRA relief must strictly comply with the requirements of Rule 1925(b), or his appellate issues will be waived. Commonwealth v. Parrish, 224 A.3d 682, 700 (Pa. 2020). Even if the trial court "correctly guesses

15

the issues appellants raise on appeal and writes an opinion pursuant to that supposition the issues are still waived." Commonwealth v. Vurimindi, 200 A.3d 1031, 1038 (Pa. Super. 2018) (citation and punctuation omitted), reargument denied (Feb. 6, 2019).

Moreover, *pro se* defendants are subject to the same rules of procedure as are represented defendants. Commonwealth v. Blakeney, 108 A.3d 739, 766 (Pa. 2014). Courts may "liberally construe materials filed by a *pro se* litigant," however, "***pro se* status confers no special benefit upon a litigant**, and a court cannot be expected to become a litigant's counsel or find more in a written *pro se* submission than is fairly conveyed in the pleading." Commonwealth v. Blakeney, 108 A.3d 739, 766 (Pa. 2014) (emphasis added) (citation omitted).

Here, in his second claim, Appellant states,

> 2) PCRA counsel was ineffective for not communicating issues with [A]ppellant[']s claims raised in his PCRA petition, or requesting other forms of supporting information or documentation such as the PCA reports (which [A]ppellant believes PCRA counsel could not have based on some of his conclusions). Prior to filing his Turner/Finley letter denying [A]ppellant a chance at a meaningful review.

(Am. 1925(b) Statement at ¶ 2). Appellant's fifth claim is similarly worded, but the issue is framed in terms of trial court error:

> 5) Did the PCRA court err in denying [A]ppellant[']s PCRA petition after [A]ppellant made the court aware of issues involving communication and the lack of available information in the form of the PCA reports for PCRA counsel to make an adequate decision in filing his no-merit letter.

(Am. 1925(b) Statement at ¶ 5).

Appellant's second and fifth claims are both waived, as this court is unable to discern which issue(s) Appellant seeks to pursue on appeal. First, it is not clear whether he asserts that PCRA counsel failed to adequately communicate with **him** or whether counsel failed to adequately communicate Appellant's PCRA claims to **this court**. Second, Appellant seemingly argues that

16

"some of" PCRA counsel's "conclusions" indicate that counsel did not have enough "information" to "adequate[ly]" review Appellant's PCRA claims. Aside from his "belief" that counsel did not review the underlying "PCA reports," Appellant offers no support for this extremely vague claim. Nor does he indicate how the outcome of the proceeding would have been different, had counsel obtained more "information." Finally, Appellant takes issue with PCRA counsel's "conclusions," but those "conclusions" (i.e., counsel's <u>Finley</u> letter) include analyses of **fifteen different** issues. (<u>See</u> Finley Letter). Appellant fails to specify which "conclusion" or "conclusions" for which he seeks appellate review. Thus, Appellant's second and fifth issues are waived.

Similarly, in Appellant's third claim, he argues that trial counsel was ineffective for failing to conduct a "thorough investigation" of the underlying events and "fail[ing] to investigate the motive behind the 2015 and 2014 allegations." (1925(b) Statement at ¶ 3). The entire claim reads,

> trial counsel[] fail[ed] to conduct a proper a[nd] thorough investigation of the following dates . . . 10-1-14, 10-2-14, 10-6-14, 10-29-15, 11-18-15, 11-19-15, this also includes claims involving the in camera hearing involving the psychiatric reports from 11-19-15 and the correspondence that accompanied the original PCRA petition. In addition[,] trial counsel[] fail[ed] to investigate the motive behind the 2015 and 2014 allegations.

(Am. 1925(b) Statement at ¶ 3).

Appellant's statement does not identify any specific fact, theory, or witness that trial counsel supposedly failed to investigate or how counsel's investigation was not "proper." Moreover, the dates cited within Appellant's statement span the course of **two years** and refer to events involving nearly every witness in this case. Appellant's third claim effectively encompasses every conceivable claim contained within his PCRA petition. It is far too broad to enable meaningful review. <u>See</u> <u>Parrish</u>, 224 A.3d at 700. Further, this court is not obligated to assume the burden of "identify[ing] potential appellate issues and fram[ing] them" for Appellant. <u>See</u> <u>id</u>. Thus, Appellant's third issue is waived.

17

Appellant's fourth claim is also waived. Appellant asserts,

> 4) PCRA counsel was ineffective for not communicating the need for more information to further the claims involving trial counsel's deletions of evidence in the form of text messages prior to trial. Denying [A]ppellant the ability to produce rebuttal evidence, and exculpatory evidence as well as character evidence for review.

(Am. 1925(b) Statement at ¶ 4).

Again, this court is unable to parse Appellant's incoherent claim. Appellant seemingly implies that if PCRA counsel had obtained "more information," then Appellant would have been able to "produce rebuttal evidence, and exculpatory evidence as well as character evidence for review." However, he does not specify what "information" counsel should have or could have obtained. Appellant also fails to explain **how** counsel's alleged failure prevented Appellant from "produc[ing] rebuttal evidence, and exculpatory evidence as well as character evidence for review." Nor does he specify what "evidence" he would have been able to present, had counsel obtained "more information." Accordingly, Appellant's fourth issue is also waived.

Finally, in Appellant's last allegation of error, he asserts the PCRA court erred "in denying [A]ppellant's PCRA petition after making the court aware of issues, which involved trial counsel deleting the text messages and violating the Rules of Professional Conduct." (Am. 1925(b) Statement at ¶ 6). This claim is waived for lack of specificity. In his PCRA petitions, Appellant asserts **numerous** claims relating to the allegedly "deleted" text messages and the evidence supposedly contained within the same.[12] Appellant's 1925(b) statement fails to identify which of these underlying claims he seeks to pursue on appeal. Thus, the issue is waived.

---

[12] For example, Appellant posits that the text messages would have proved, *inter alia*, D.J. was being "bullied" at school because she sent sexually explicit photos to a peer on Facebook, (Am. PCRA Pet. at 4, 8); Appellant "enforce[ed] structure and discipline" in Lyons's home, (Id. at 5, 8); Lyons "constantly" lied to Appellant about D.J.'s "whereabouts," (Id. at 5); D.J.'s sister reported sexual abuse by their uncle, which D.J. may have overheard, (Id. at 10); and D.J. knew about the dispute between Appellant and Lyons prior to disclosing the underlying incidents to PCA on November 19, 2015. (Id. at 18).

18

Moreover, Appellant's claim that trial counsel deleted text messages from Appellant's phone is unfounded. See (PCRA Pet. at 10–12, 18; Am. PCRA Pet. at 4–8). The only proof offered in support of this claim is Appellant's "belie[f]" that trial counsel "deleted evidence" (i.e., Appellant's text messages) so that counsel could "proceed with his own flawed defense, against [Appellant]'s interest." (Id. at 4, 6). This wholly unsubstantiated accusation is not a sufficient basis on which to deem trial counsel ineffective.

## CONCLUSION

This court has undertaken careful review of the record and finds no harmful, prejudicial, or reversible errors, and its order dismissing Appellant's PCRA petition should be affirmed.

BY THE COURT:

Lane, J.

19

## IN THE COURT OF COMMON PLEAS
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CRIMINAL TRIAL DIVISION

COMMONWEALTH OF PENNSYLVANIA     :     CP-51-CR-0005594-2017

                 : 

         v.                :

                 :

     ROY WINDOM            :        1942 EDA 2021

### PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa. R. Crim. P. 114:

District Attorney:     Paul George, Esquire
                        Supervisor, Law Division
                        Philadelphia District Attorney's Office
                        Three South Penn Square
                        Philadelphia, PA 19107-3499

Type of Service:     (✓) First Class Mail () Certified () Personal Service

Pro Se Appellant:     Roy Windom/ Inmate # QA9432
                        SCI Huntingdon
                        1100 Pike Street
                        Huntingdon, PA 16652

Type of Service:     () First Class Mail (✓) Certified () Personal Service
                        **Tracking Number: 7015 0640 0005 7345 6696**

Date November 9, 2021

Jessica Stachelrodt, Esquire
Law Clerk

# Trial Court Attachment A

Commonwealth v. Windom
CP-51-CR-0005594-2017
1942 EDA 2021

DC-198
Rev. 11-11

# MOTION FOR POST CONVICTION COLLATERAL RELIEF

| COMMONWEALTH OF PENNSYLVANIA VS | COURT AND DOCKET NUMBERS |
|---|---|
| Roy Windon, A.<br><br>(Name of Defendant) | **FILED**<br><br>MAY 0 7 2021<br><br>PCRA Unit<br>CP Criminal Listings<br><br>To be completed by Clerk of Court |

NOTE: List below those informations or indictments & offenses for which you have not completed your sentence.

**INFORMATION OR INDICTMENT NUMBERS:**

Rape of a Child (F-1), Unlawful contact with a minor (F-1) endangering the welfare of a child, (F-2) indicent assult of a person less

Then thirteen

CP-51-CR-0005594-2017

**I WAS CONVICTED OF THE FOLLOWING CRIMES:**

Rap of a child, unlawful contact with a minor, enderngering the welfare of a child indicent assult of a person less then thirteen.

1

**Trial Court Attachment**

ORIGINAL                                    1

**1. MY NAME IS:**

Roy Windom, A

**2. I AM NOW**

(a) ☐ On Parole    (b) ☐ On Probation    (c) ☒ Confined in BCI Huntingdon

(d) ☐ Residing at _____

**3.**

I WAS SENTENCED ON __Janurary 13th__, 2 _20_ TO A TOTAL TERM

OF _12½ - 25 yrs_, COMMENCING ON __Janurary 13th__, 2 _20_ BY

JUDGE(S) _Vimika Lane_

FOLLOWING A:    ☒ Trial by jury              ☐ Plea of Guilty

              ☐ Trial by a judge without a jury    ☐ Plea of nolo contendere

      I am  ☒ Serving              ☐ Waiting to serve    The Sentence Imposed

**4. I AM ELIGIBLE FOR RELIEF BECAUSE OF:**

☒ (I)    A violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

☒ (II)    Ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place.

☐ (III)    A plea of guilty unlawfully induced where the circumstances make it likely that the inducement caused the petitioner to plead guilty and the petitioner is innocent.

☐ (IV)    The improper obstruction by government officials of the petitioner's right of appeal where a meritorious appealable issue existed and was properly preserved in the trial court.

☒ (V)    The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

☐ (VI)    The imposition of a sentence greater than the lawful maximum.

☐ (VII)    A proceeding in a tribunal without jurisdiction.

2

**Trial Court Attachment**

**5. I AM ELIGIBLE FOR RELIEF BECAUSE, ALTHOUGH THIS PCRA PETITION IS BEING FILED MORE THAN ONE YEAR AFTER THE DATE OF FINAL JUDGMENT, I HEREBY ALLEGE AND CAN PROVE THAT THE FOLLOWING EXCEPTION HAS BEEN MET:**

☐ **(I)** **My failure to raise this claim previously was the result of interference by government officials with the presentation of the claim in violation of the Constitution or laws of this Commonwealth or the Constitution or laws of the United States.**

I intend to prove my claim was late due to governmental interference by showing:

_____

_____

_____

_____

☐ **(II)** **The facts upon which the claims is predicated were unknown to the petitioner and could not have been ascertained by the exercise of due diligence.**

The following facts were previously unknown to me:

_____

_____

_____

_____

☐ **(III)** **The right asserted is a constitutional right that was recognized by the Supreme Court of the United States or the Supreme Court of Pennsylvania after the time period provided in this section and has been held by that court to apply retroactively.**

The Supreme Court of the United States or the Commonwealth of Pennsylvania has recognized the following retroactive constitutional rights after my period for filing:

_____

_____

_____

_____

3

**Trial Court Attachment**

**6. THE FACTS IN SUPPORT OF THE ALLEGED ERROR(S) UPON WHICH THIS MOTION IS BASED ARE AS FOLLOWS:** (State facts clearly and fully; argument, citations, or discussions of authorities shall not be included.)

(A) I know the following facts to be true of my own personal knowledge:

Upon my arrest Richard Giuliani was appointed to me. I expressed that Doretta Jhons made allegations against me in retaliation from events involving her mother. On or around Oct. 29, 2015. Doretta was taken to PCA for a unknown reason where for the 3rd time she denied allegations. On Nov. 18, 2015 Tonya Lyons went to see Doretta Jhons at the Bridge. Doretta became upset at the visit and the next day asked to make allegations. (Trial counsel did not argue motive, object to prosecutorial misconduct over motive) Witness Tonya Lyons corroborated false testimony because of these events.

⤷ Next piece of paper →

⤷ Disregard This improper format

(B) The following facts were made known to me by means other than my own personal knowledge (Explain how and by whom you are informed):

~~Recantation by Doretta Jhons~~ ~~Witness Montaya~~ ~~in which~~ ~~ADA Freeman~~

Recantation and Willingness to testify on my behalf, by Tonya Lyons. She reached out to me through witness Marquetta Lyons. Tonya Lyons also informed ADA Freeman and his supervisor of her willing to testify.

(C) In the event my appeal is allowed as requested under #4, the following are the matters which I intend to assert on that appeal (Specify the matters to be asserted if appeal is allowed)

Was trial counsel Ineffective for not. Investigating, or arguing Applnts reason for motive to fabricate 2015 allegation for either of the CommonWealths witnesses? Was trial counsel Ineffective for not objecting to the CommonWealths Closing arguments which ventured into prosecutorial misconduct?    ⟹ Next page Was trial counsel Ineffective for destroying evidence and violating the Pennsylvania Rules of Proffesional Conduct? for Trial Court Attachment

ORIGINAL                                          4

Supporting facts of Claims to be made on this PCRA

(A) I know the following to be true of my own personal knowledge.

- The abuse allegations that prompted Josiah and Doretta Jhons to be sent to their fathers were false.

A few months prior to the physical abuse allegations in 2014. Tonya Lyons initiated a lie about a cousin on Doretta and Josiah's father side wanting to take them to Disney World for the summer, which I was against because their father James Jhons had a history of attempting to trick Tonya Lyons into sending Josiah and Doretta to Delaware using his mother (Josiah & Doretta's grandmother). James Jhons had a history of drug addiction, Domestic abuse he also made his intentions known early on in the breakup that he only wanted the children as a way to control Tonya Lyons.

A few months prior to the physical abuse allegations Tonya Lyons made me aware that a cousin on Josiah and Doretta's father side wanted to take them to Disney World for the summer in 2014, which I was against because I believed was another attempt by James Jhons into tricking Tonya Lyons into sending the children to Delaware so he could get them. This decision created tension between Josiah and Doretta with me. This is how the abuse allegations begin to come about. Also at this time there was a issue with Tonya Lyons and her involvement in a romance scheme with a person nameed Micheal Xavier Garrett (Tonya has a tattoo with their name on her arm) which clouded her judgement and led her to making critical mistakes such as: influencing the kids to make false allegations of abuse, and sending them to their father knowing his intentions before hand. The abuse allegations were a means of getting me out of the house.

**Trial Court Attachment**

Josiah and Doretta were sent to their fathers even though he had a long history of drug addiction and Domestic violence. There was a deception of them being with a cousin in regards to my knowledge. information given to me by Tonya Lyons. There wasn't suppose to be a permanent situation only for the summer, instead their father wouldn't give them back when the end of the summer came (something Tonya Lyons was aware would happen this is why she kept them away from their father prior to this event) This is when the sexual assault allegations first came about 8-28-14.

- James Jhons had reason to coach Doretta Jhons into making allegations for years. James Jhons struggled with drug addiction and had a history of domestic abuse, he also spent 8 years in a Florida prison prior to meeting Tonya Lyons. As I mentioned earlier prior to these events Tonya Lyons would have never sent them to live or visit him because she knew his intentions were simply to control her through the kids, James Jhons had motive in coaching Doretta to make allegations as a means to keep them knowing with his history he would never be able to get custody in a traditional custody battle.

- Doretta Jhons had motive aswell a few months prior to the above allegations Doretta was caught on facebook sending nude pictures to another child who attended William D Kelly, also revealed was messages of her being bullied by other children because of this. There was also the issue of of the time Doretta wanting to go stay with Althea Jhons her grandmother on her fathers side, which I also was against knowing that this was a ploy to lure her to her father in Dover Delaware. This made her encouragable and easily manipulated enough so she would have given into the coaching, or even initiated the fake allegations.

**Trial Court Attachment**

- There was a previous allegation of sexual assault made by Marquetta Lyons in January of 2012 against our uncle Robert Lyons. These allegations were revisited in 2013, because Marquetta Lyons moved out the house, and while cleaning her room I found a diary detailing this abuse. Some of the details concerned me because they were contrary to what I was originally was told by Tonya Lyons. In Tonya Lyons account of what happened our uncle only touched Marquetta and exposed himself to her there was also a account that at the time of his interview he admitted to these allegations. By me never seeing any paper work of these allegations or confession, and knowing at the time there did exist a possibility that Tonya Lyons would fabricate a lie due to her already being overwelmed with her current responsibility in caring for the household as a single parent, and then having to also take on that which came with my uncle being he was deaf and sufferd from mental health problems since childhood. I begin to pursue my own inquiry into the situation by not talking to Marquetta about it I had to depend on Tonya Lyons to get the needed information to confirm the allegations and the confession. inorder to confirm the right decision was made concerning the legal action against our uncle. Tonya Lyons was slow to act on these concerns which at times turned into arguments because time was a issue being this was a year and a half later. This was ongoing prior to Delaware and after Delaware. Sexual assault was a conversation in the house leading up to the allegations, even with Doretta and Josiah as a means to prevent something like this happing. This was something that could have been known to James Jhons through his mother who Tonya Lyons aswell as to Doretta Jhons through conversations about preventing sexual assults and conversations or arguments between myself and Tonya Lyons.

**Trial Court Attachment**

- Issues that took place after Delaware, there were allegations of James Jhons leaving Doretta and Josiah in the house for days at a time to care not only for themselves, but their elderly grandmother, which had a affect on Doretta mainly because she was left in charge. This created a level of aggression in Doretta and a since of independence that made her lash at more. There was also the fact that she came back to the bullying and steaming from her school mates. This made Doretta not want to attend school, On the day she went to school and complained about me coming to the house which led to the removal from the house of Doretta and the other children residing there at the time. Because I encouraged Tonya Lyons to better parent the household because she was still preoccupied with the romance scheme at the time, and was sending money to this person which affected her getting Doretta what she needed for school because in a effort not to attend school Doretta was destroying her school cloths. The romance scheme also affected the relationship between me and the family because Josiah and Doretta was exposed to it by having conversations with this person aswell as promises made by this person to move them to New Jersey when he returned to the States. This person at the time pertended to by a three star general with the army corps of engineers deployed in Nigeria. This also created issue with myself and Tonya Lyons because I attempted to convience her this was a scam. This currried over to 2016. Tonya Lyons also revealed this to the then CPS worker Trina Jenkins.

**Trial Court Attachment**

- The issues that led to the 2015 allegations. On October 29, 2015 Doretta was taken to PCA by her mother at the time though Doretta Jhons was suppose to be inpatient at the Bridge and couldn't have been with her mother. I am aware that on several occasions at the time Doretta had ran away from the Bridge. The next day on the 30th of October money was stolen from me off a debt card that was accidently sent to the 1626 N.Newkirk residence of Tonya Lyons. It was later discovered that Tonya Lyons stole the money because the card used to steal the money was activated at Tonya Lyons place of employment the Philadelphia Turf Club. At the time I didn't go through with the claim after finding out it was Tonya Lyons who stole the money, being that she was my mother and I didn't want to get her in trouble, and she also was in trouble with PNC bank for cashing a fake check that was given to her by the person scaming her the check was issued through US bank. But on November 18th 2015 Tonya Lyons sent me a series of text messages holding me responsible for the lost of her job, claiming I gave the bank her job information which led her to being accused of stealing the money. This was a criminal act commited at her place of employment and a investigation would have led to her being she activated the card using her employers phone which would have led to a immiciate termination. This occured the sameday she visited Doretta Jhons at the Bridge. There was a very visiable change in Doretta's behavior on the 18th and Per the PCA reports Doretta was so angry at the visit her CPS worker Ms Orr was called to talk to Doretta (which Doretta refused). The next day on November 19th 2015 Doretta woke up that morning sucidal and after being talked down by her therapist expressed regret over the abse allegations that led to her and the other children being taken, my finicial contibution to the household and spcifically expressed anger over the text messages the day before and then asked to go to PCA to make allegations. I believe Doretta was aware of the contents in the messages, and was angered over her mother losing her job9 and became overwelmed with the situation and held me responsible. I believe

because of this she made the allegations. I also believe because of the earlier visit to PCA (2 weeks prior), and the inconsistancies in that visit and being reinterdaced to the allegations at that time, and the reasonable possibility that the visit to PCA and the reason for this visit being unclear this incident was added to be part of her treatment plan to get clear answers to the reason for the visit and who had taken her being that is also unclear from the language used in the PCA reports. I believe because of this visit and continued intreast from CPS, and her therapist is why she chose the allegations, and was so comfortable in knowingly making false allegations. I believe this visit indirectly influenced Doretta into making the allegations when faced with the loss of her mothers job.

- Trial counsel tampered with evidence. I understood that alot of the stations I previosly coverd in the earlier fact rely on alot of information that would be hard to prove, but I hoped because of the communication issues me and Tonya Lyons had over this time period alot of this information was coverd in text messages to avoid arguments and confirm alot of this information to Tonya Lyons for later reflection. I was able to get the Galaxy S5 I used to trial counsel towards the end of March 2019. The phone was accompanied both a letter confirming that the desired information was present and help trial counsel identify this desired information. Trial counsel initally confirmed both the letter and the phone and said he was going to get the charger that didn't come with the phone. After recieving the phone trial counsel stated he needed to send a request to the warden of the jail to get permission to bring the phone in for inspection (this was a request that was never answerd) this request was never answerd, I not only requested the person who took trial counsel the phone to take him a letter verfying the information I also wrote trial counsel a letter verfying the information, but also the desired use of the information at trial.

10
**Trial Court Attachment**

This information was vital to show the needed motives and underlying issues in the house in conversations had with Tonya Lyons. Again the request was never answered by the jail and trial counsel never used the letters to confirm or identify the requested information, actually in a later phone call trial counsel denied ever recieving the letter that came with the phone. The day before trial, trial counsel asked for the password to the phone in a effort to retrieve the desired information. The day of jury selection I asked trial counsel about the phone he said that the desired information wasn't present, trial counsel did show me the phone and I observed that the information had been deleted. The things that led me to believe trial counsel deleted this information was: (1) The way the information was deleted in the phone there were two specific locations with the desired information the regular sms messages within the phone which would have been the location of text message ranging from early 2014 through to 2015 this would have consisted of hundred of text messages, and a text free application with text messages ranging from August 2015 through to November-December of 2015. As I mentioned the regular sms messages in the phone under Tonya Lyons (mom) would have contained hundreds of messages, and the text free application I specifically identified a hand full of messages ranging from Oct. 29. 2015 through to November 19. 2015. In the sms messages the tab to go into the messages was still present but the contents were deleted, and in the text free application only the messages from Nov. 29. 2015 on were deleted. The reason I believe they were deleted in this way was because the messages in the regular sms contained hundreds of messages and I identified numerous messages over a two year period too many message to individually delete so I believe trial counsel may have begun to individually delete relizing how time consuming it would be marked all of them and deleted it (why the tab was still present), and I only identified a handful of messages in the text free application which would have been easier

(2) what led me to further believe trial counsel deleted these messages was when I thought I noticed something that may explain the October 29, 2016 visit from a text sent the day earlier in the text free application trial counsel immediately took the phone and insisted on the information not being there. (3) and the person who took trial counsel left text messages exchanged between the two of us in the phone, and when asked the next day about whether the information was present in the phone the person who took trial counsel the phone insisted on the information being there confirming they didn't delete anything.

- A digital forensic analyst of the phone should retrieve this missing information Petitioner never recieved the phone after trial or sentencing and trial counsel had no other parties information to mail it too, so trial counsel should still be in possesion of the phone. also a digital forensic analyst of the phone should show when the deletions took place trial counsel was in possesion of phone after March 2019.

The Commonwealth commited prosecutorial misconduct in his closing arguments when he led the jury to believe that Doretta Jhons only recanted her 2014 allegations after finding out of her fathers passing. This statement was untrue and did not relate back to the evidence on record.

Doretta Jhons originally recanted her allegations on 10-6-14 weeks before her father passed according to the PCA report. The case was reopened my P.P.D to have Doretta on record confirming or denying the allegations due to her fathers unwillingness to have Doretta participate in the original scheduled forensic interviews. Doretta's father passed 10-22-14, and the new forensic interview was conducted 10-31-14, but Doretta's original recantation came on 10-6-14 which prompted police to reopen the case and request the 10-31-14 forensic interview.

The CommonWealth also commited prosectorial misconduct in his closing arguments when he revisted petitioners attempted testimony (that originally was objected to by the CommonWealth and sustained by the court) in his closing arguments where petitioner attempted to clarify motive and intent for both CommonWealths to fabricate allegation. The CommonWeath assured the jury that even if some event did take place Doretta Jhons had no way of knowing or that she was placed at the Bridge and had no contact with petitioner. This also is untrue according to the evidence on record Doretta Jhons on 11-19-15 stated to her therapist that she was upset about a exchange that took place on 11-18-15 between petitioner and CommonWealth witness Tonya Lyons, this is what connected the two of us after her removal from the hare.

Petitioner requested the following investigations and gathering of evidence from trial counsel

2014

CPS Records from Philadelphia, Dover Delaware CPS records, inorder to confirm the events from 10-1-14 and 10-2-14, because there were accounts of coaching involving both Doretta and Josiah, and there was a accidental or deliberate effort to leave out the incident with Josiah by CPS worker Trina Jenkins combined with the accidental or deliberate typo or retelling of the cause for Trina Jenkins visit to Delaware on 10-1-14, I requested trial counsel retrieve the CPS records from Delaware after becoming familiar with CPSL (Child Protective Services Law), and coming to understand jurisdiction authority gave Philadelphia CPS authority over the case. So being able to compare the two accounts could give me a opportunity to call in question the investigation from Philadelphia CPS.
- This information would also have given me the ability to bolster the coaching aspect of the case if Josiah and/or Doretta made coaching allegations prior to coming to Philadelphia

CPS in Philadelphia's records also contained prior complaints of the house, aswell as the domestic abuse history of James Jhons.

2015

I requested trial counsel to also aquire CPS records from the Philadelphia agency concerning the:

11-29-15 visit to PCA the investigation that should have occured following this visit with the numerous inconsistancies involved and the unclear reason for this visit, and the issue with who had taken Doretta there to begin with and why Doretta wasn't at the Bridge. The reason I believe there is a issue with who had taken Doretta to PCA on 10-29-15 is because there would have also been a questioning of the adult who had taken Doretta to PCA in a effort to see what prompted the visit to begin with, and because it seem Doretta may have given the information that it was Tonya Lyons its fair to assume Tonya Lyons may have simply dropped Doretta off and left.

Cash Global the bank the money was stolen from to confirm when, and where the card was activated and any further investigation into the transactions that occured afterwards

The Philadelphia Turf Club to confirm when and why Tonya Lyons was terminated to confirm cause, and to give substance to motive confirming the date of the termination

Trial counsel did get the CPS records in April of 2019, but didn't give them to petitioner two weeks prior to trial, but only gave them to petitioner at the end of the visit and never returned to CFCF the next time petitioner seen trial counsel was the day before jury selection.

This can be confirmed by requesting legal mail records and legal visit log in's, to confirm there were no exchanges between petitioner and trial counsel for months leading up to trial specifically March, or April.

I also request a examination of phone calls had with trial counsel through out the pretrial process to confirm the communications between petitioner and trial counsel, specifically those had after March 2019 to confirm when he got the phone and letter and to also confirm the numerous letters sent to trial counsel through out this process. letters he should still have with my case file. Insight into these conversations should give petitioner a better chance at proving trial counsel's ineffectiveness. most of these conversations took place over a unsecured telephone conversation, aswell on trial counsel's cell phone.

There was also present in these CPS records, information where Doretta attempted to make a prior false allegation, where petitioner could have faced attempted kidnapping charges. Doretta also excluded petitioners physical presence from the Oct. 29, 2015 incident in a conversation with CPS worker Taqqya Orr in which Doretta was asked when was the last time she seen petitioner and Doretta stated the summer of 2015, neither is possible because Doretta was placed at the Bridge June 2015. The other requested information was not present in the CPS records, concerning the 2014 incident specifically 10-1-14 and 10-2-14. There also was a exchange that took place between Doretta and Tonya on 11-18-15 described where Doretta and Tonya traded sneakers.

**Trial Court Attachment**

Ineffective Assistance Of Counsel

(C) I intend to assert the following on appeal

1) Trial counsel was ineffective for failing to conduct a thorough and proper investigation into motive to fabricate in regards to the allegations made by Doretta Jhons, and, Tonya Lyons willingness to no challenge intally or her intent and motive to knowingly support fabricated allegations at trial.

2) Trial counsel was ineffective for failing to investigate motive for the 2014 allegations

3) Trial counsel was ineffective for failing to investigate the various investigative points laid out by petitioner in letters and official visits surrounding the following dates. 10-1-14, 10-2-14, 10-6-14 through to 10-29-15, aswell as 11-18-15, 11-19-15.

4) Trial counsel was ineffective for failing to request a psychatric evaluation of Tonya Lyons being there were concerns about her mental health.

5) Trial counsel failed to investigate whether or not a psychatric report exsisted of the conversation between Doretta Jhons and her therapist on 11-19-15, or request a in-camera hearing of those report by her Honor to evaluate the full context of this conversation being that Doretta Jhons did comment on a exchange that took place between petitoner and CommonWealth witness Tonya Lyons.

**Trial Court Attachment**

6) Trial counsel was ineffective for showing a lack of due dilligence in investigating evidence in the form of text messages to help bolster motive, intent, aswell as chracter evidence and the ability to show underlying problems which gave way to the enviorment for these false allegations to grow.

7) Trial counsel was ineffective for not investigating evidence in the for of text messages to attempt to file a motion to limine to admit evidence of a past confession of a sexual assult by another family member in 2012 and the continued conversation well into 2014 before and after the initial 2014 allegation by Doretta Jhons, which colel have been know by Doretta Jhons and/or her father James Jhons.

8) Trial counsel was ineffective for tampering with evidence and violating the ABA rules of proffesial conduct in the form of deleting those messages.

9) Trial counsel was ineffective for failing to request a taint hearing.

10) Trial counsel was ineffective for failing to object to Common Wealth closing arguments

11) Trial counsel was ineffective for not having petitoner present during jury questions and agreeing to not have the view PCA reports, atleast relevant aspects or report relating to improper comments by the Common Wealth.

12) Trial counsel was ineffective for failing to investigate school counselor Ms. Miller who Doretta claimed to have revealed prior assult to

18
**Trial Court Attachment**

Prosecutorial Misconduct

13) The CommonWealth commited prosecutorial misconduct in his closing remarks which were improper and no longer related back to the evidence.

14) The comilation of errors denied petitoner a fair trial (Prosectorial misconduct, Ineffective assistance of counsel.

15) Trial counsel was ineffective for failing to investigate domestic abuse background of James Shoes, and his history of drug addiction, being both were mentioned in the evidence.

## 7. SUPPORTING EXHIBITS

(A) In support of this motion I have attached as exhibits:

☐ Affidavits            [Exhibit(s) No. 1) *letter to attorney* ]

☑ Records               [Exhibit(s) No. 2) *letter to attorney* ]

☑ Other Supporting Evidence    [Exhibit(s) No. 3) *case file* ]

(B) I have not attached any affidavits, records or other supporting evidence because

_____

_____

_____

## 8. I HAVE TAKEN THE FOLLOWING ACTION(S) TO SECURE RELIEF FROM MY CONVICTION(S) OR SENTENCE(S):

(A) Direct Appeal      (IF "YES," name the court(s) to which appeal(s) was/were taken, date, term and number, and result.)

☑ YES    ☐ NO

Superior Court Of Pennsylvania, February 11, 2020, 2017-607 EDA 2020 CP-51-0005594 *Denied*

Supreme Court Of Pennsylvania

---

(B) Previous proceedings in the courts of the Commonwealth of Pennsylvania

☐ YES    ☑ NO     (IF "YES," name the type of proceedings (such as habeas corpus, etc.) — including former proceedings under the Post Conviction Hearing Act the Court(s) in which petition(s) was/were filed, date, term and number, and result, including all appeals.)

_____

_____

---

(C) Habeas Corpus or other petitions in Federal Courts

☐ YES    ☑ NO     (IF "YES," name the district in which petition(s) was/were filed, date(s), Court Number — civil action or miscellaneous, and result, including all appeals.)

_____

_____

---

(D) Other legal proceedings

☐ YES    ☑ NO     (IF "YES," give complete details — type of action, court in which filed, date, term and number, and result, including all appeals.)

_____

**20**

**Trial Court Attachment**

**9. FOLLOWING MY ARREST, I WAS REPRESENTED BY THE FOLLOWING LAWYER(S): (Give the lawyer's name and the proceeding at which he/she represented you.)**

Richard J. Giuliani — Preliminary - Trial

William C. Montoya - Sentencing - Direct Appeal

**10. I PREVIOUSLY CHALLENGED MY CONVICTION IN THE FOLLOWING COURTS:**

| Court | Caption | Term Number | Attorney | Relief Requested |
|-------|---------|-------------|----------|------------------|
| Superior - | Roy A. Windon V. Comm, | 607 EDA 2020. | William Montoya, | Denied |

**11. THE ISSUES WHICH I HAVE RAISED IN THIS MOTION HAVE NOT BEEN PREVIOUSLY LITIGATED OR ONE OF THE FOLLOWING APPLIES:**

☐ (I) The allegation of error has not been waived.

☒ (II) If the allegation of error has been waived, the alleged error has resulted in the conviction or affirmation of sentence of an innocent individual.

The failure to litigate this issue(s) prior to or during trial or on direct appeal could not have been the result of any rational, strategic, or tactical decision by counsel.

**12. BECAUSE OF THE FOREGOING REASONS, THE RELIEF WHICH I DESIRE IS:**

(A) ☒ Release from custody and discharge

(B) ☒ A new trial

(C) ☐ Correction of Sentence

(D) ☒ Other Relief (Specify): Reduction in bail if not released

21

Trial Court Attachment

13. I request an evidentiary hearing.  I certify, subject to the penalties for unsworn falsification to authorities set forth at 18 Pa.C.S. § 4904, that the following persons will testify to the matters stated. I have attached to this petition all documents material to the witness' testimony.

Witness Name: Marquetta Lyons
Witness Address: 252 6 W Hollywood ST. Phila, PA, 19132
Witness Date of Birth: 6-28-93
Witness Testimony: Doretta Jhons and Tonya Lyons lied about Doretta sleeping in back room, Doretta Jhons informed her she lied previously, Tonya Lyons willing to testify on my behalf. (Marquetta Lyons is sibling to both parties)

Witness Name: Tonya Lyons
Witness Address: 2526 W. Hollywood ST Phila PA 19132
Witness Date of Birth: 8-14-66
Witness Testimony: She said Doretta lied later on after conversation recanted her earlier testimony

Witness Name: Marquetta Lyons
Witness Address: 2525 W. Dauphin ST Phila PA 19132 (New address)
Witness Date of Birth: 6-28-93
Witness Testimony: She will be able to testify to the composition of household character evidence relating to all 3 parties involved facts known to her

Witness Name: _____
Witness Address: _____
Witness Date of Birth: _____
Witness Testimony: _____

14. Based upon the exceptional circumstances set forth below, I request that the District Attorney produce the following documents:

Brady material consistant with any recantation from Doretta Jhons after trial, aswell as any recantation and/or willingness of former Commonwealth witness Tonya Lyons, Any thing exculptory in the form of CPS records pertaining to the most mental health of Tonya Lyons and Doretta Jhons, Tonya made it known she wanted to testify on my behalf.
With this I also request any thing exculptory governed by Jhon E. Brady which upon request with good standing anything exculptory be turned over to the defense. A request for the complete CPS records from both Delaware CPS, Philadelphia CPS records

22

**Trial Court Attachment**

**15. I ask that the Court consider the following argument, citation and discussion of authorities:**

**16.**

(A) I am ☐ ABLE  ☒ NOT ABLE to pay the cost of this proceeding.

I have $ _53/_ in my prison account.

(B) My other financial resources are:

None at this time

**17.** (A) ☐ I do not have a lawyer and I am without financial resources or otherwise unable to obtain a lawyer.

(1) ☒ I request the court to appoint a lawyer to represent me.

(2) ☐ I do not want a lawyer to represent me.

(B) ☐ I am represented by a lawyer. (Give name and address of your lawyer.)

_Ray Winslow_
(Signature of Defendant)

23
Trial Court Attachment

I ask the court to consider the following argument, citation, and discussion of authorities

The bulk of my claims deal in trial counsel's ineffectiveness prior to trial and during trial. With the allegations against me there are various hurdles to overcome such as, the sheer emotional reaction to the allegations, the amount of coverage in the media concerning this particular allegation, the number of people affected by this particular allegation, and the witnesses against me (mother and sister). Establishing a motive as to why was I the target of this specific allegation, and why was this allegation chosen to attack me? Every case is a balancing act with the complaint as the balancing point and the presented evidence tilting the favor in either the direction of the defense or the prosecution.

As the accused we depend on lawyer's to present our cases to the trier of fact (judge or jury), we depend on their knowledge and skill to meet the prosecutions case. The Sixth Amendment entitles a criminal defendant not just counsel but effective counsel, Pennsylvania has adopted the Strickland test to determine whether or not trial counsel was effective: (1) that counsel's performance was deficient, which requires a showing that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment', and (2) that the deficient performance prejudiced the defense, which requires a showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. A fair trial is defined as a trial in which evidence subject to adversarial testing is presented to an impartial tribunal for resolution of issues defined in advance of the proceeding. According to Criminal law § 46.4 - ineffective counsel, counsel can deprive a defendant of right to effective assistance of counsel simply by failing to render adequate legal assistance.

As defined in Criminal law § 46.4 - counsel's duties. In representing a criminal defendant, counsel owes a duty to the client of loyalty, a duty to avoid conflicts of interest, a duty to keep defendant informed of important developments in the course of the prosecution, and a duty to again bear such knowledge and skill as will render the trial a reliable adversarial testing process. As I outlined in my supporting fact and my claims to be asserted in this motion I outlined numerous investigative points for trial counsel to look into. Ranging from the initial allegations in 2014 to those made in 2015, as you will see in the letters accumping this motion petitioner understood that both sides of the spectrum had to be investigated and explained to produce a reliable and effective line of defense. I also understood that inorder to create a effective line of defense I also had to explain the underlying issues that would explain the enviorment to allow these fabricated allegations to mature. I am also aware of the fine line I walked as well, being that the same conditions that could allow fabricated allegations to mature also could be the same enviorment for these allegations to be true aswell. As you will see from the evidence presented at trial and the things asked of trial counsel all related back to the evidence.

I requested of trial counsel to intally investigate the motive for the November 15, 2015 allegations being this motive was more straight foreward. As you will see in the PCA report from 2015 Doretta Jhons and Tonya Lyons met at the bridge for a family visit. According to the PCA reports there was a sudden change in Doretta Jhons behavior at this visit this behavioral change was so concerning to staff the called her then CPS worker Ms. Orr (who Doretta refused to talk to) The next morning Doretta was suicidal and made statements in regards to a regret over her abuse allegations that led to not only her removal from the household, but that of her brother Josiah, niece Latoya, nephew Stephan

**Trial Court Attachment**

Doretta also acknowledge my financial contibution to the household, aswell as anger over a series of text messages between Tonya Lyons and myself. after being talked down by her therapist Doretta specifically requested to go to PCA to make the allegations. Doretta unexpectantly showed up to PCA two weeks prior where at some point she was asked about the allegations and she told them petitioner did nothing.

I explained to trial counsel that these events parallell another series of events that took place at this time, which led to Tonya Lyons being fired on 11-18-15, and with the facts being, Doretta's behavioral change came during the visit, Doretta's only time ever mentioning financial situations, combined with Doretta acknowledging the text messages, text messages from Tonya Lyons accusing petitioner of being responsible for the loss of her job on that specific day is a solid basis for motive, aswell as showing the much needed behaviors that would lead Doretta to making a false allegation, aswell as Tonya's unwillingness to challenge them initially and come to court and fabricate testimony. I also requested trial counsel to investigate the October 29, 2015 visit to PCA, because, (1) Doretta was inpatient at the Bridge meaning she couldn't go anywhere without a staff member, (2) there was a issue with who had taken Doretta to PCA, even though its said the Tonya Lyons was identified as being the person who brought her in its clear there is no information as to what prompted the visit from Doretta or the adult who brought her in which would be procedure, and according to the PCA reports it was considerd along time when Doretta and Tonya met on 11-18-15. I expressed to trial counsel gathering the fact surronding the 10-29-15 visit and any insuing investigation afterwards was critical to determing why Doretta chose this allegation at that time, being its very well possible that it was this visit and the questions ask that indirectly gave Doretta the confidence to fabricate the allegation being we didn't have any contact what so ever at the time but in this moment through Tonya Lyons

26
**Trial Court Attachment**

This would have established motive being that Tonya Lyons stole from me which led to her firing, and these events took place at the sametime as those mentioned in the evidence, and explaining why Tonya Lyons wouldn't want Doretta to reveal to CPS about her losing her job (at the time Tonya Lyons was actively attempting to get the kids back and losing her job would have hendered that, also she commited a criminal act using her jobs phone. CPS would have the authority to ask questions of her job asto why she was fired) and CPS investigating how she lost her job especially if Doretta told them I was responsible. This would have led Doretta to being told by Tonya not to mention this to anyone especially CPS the decision maker (why I believe Doretta refused to talk to CPS). This would have led to Doretta being placed on a island and given a level of independence too much for someone her age. This is clear from her reaction the next morning.

At trial, trial counsel asserted no motive what so ever. The prejudice came when the courts instruction aswell as the prosecution case made the jury aware of the fact that the only person who has motive to lie and a intrest in the outcome of trial was the defendant when one clearly did exist and was relaid to trial counsel. This left such a void in my defense that it opened up the prosecutorial misconduct in his closing remark. In a attempt to rectify trial counsel's mistake I believed I still could go into it, which was objected to by the prosecution and upheld by the court, but the Commonwealth revisited this statement in his closing argument assuring the jury that even if something did happen there was no way Doretta would have known. This does not relate back to the evidence, because the evidence clearly shows Doretta's acknowledgement of the text messages. Without establishing motive trial counsel also failed to properly explain the missing events in the timeline which led to uncontested damaging testimony from Tonya Lyons and Doretta Jhons.

This leads me to the 2014 allegation there were allegations of coaching, abuse and drug addiction involving James Jhons Doretta and Josiah's father. On 10-6-14 Josiah and Doretta ran away from their fathers this is when Doretta said it was her father who coached her into making the allegations. I informed trial counsel that I was aware that the event that prompted his abuse and the cause of the 10-2-14 visit by Trina Jenkins revolved around Josiah refusal to be coached into lying, which was missing from the CPS report and the PCA report. I expressed to trial counsel this was worth looking into because if Josiah did report this and it was recorded it could bolster the coaching allegation made by Doretta on 10-6-14, and a bonus would be if Doretta was also asked about her fathers action it possible she may have confirmed the coaching prior to coming to Philadelphia. This could have also called into question Trina Jenkins intention.

The only missing part was the more in depth underlying issues, to bring together the problems with the parenting aspect of the station, which I had a opprtuity to bring to bear in the contents of the phone provided to trial counsel March of 2019. This gave me a opprtunity to dive deeper into the mental health problems with Tonya Lyons concers with her parenting, aswell as the Domestic abuse history of James Jhons, the exchange that took place on 11-18-15, and the underlying problems that led to Doretta being subseptable to the coaching from her father. As I mentioned in my factd support I believe trial counsel deleted these messages over a conflict of intreast in his defense.

I believe if the court examines the two letters, phone conversation with trial counsel that will confirm other letters sent to trial counsel, aswell as misinformation given by trial counsel, grant funding for the phone to be examend, and take into consideration the defense I requested and that in which trial counsel renderd at trial and prior to trial. You'll see that

Trial counsel was completly ineffective.

**Trial Court Attachment**

## UNSWORN DECLARATION

I, *Roy Windom, A* _____ do hereby verify that

the facts set forth in the above motion are true and correct

to the best of my personal knowledge or information and

belief, and that any false statements herein are made sub-

ject to the penalties of Section 4904 of the Crimes Code

(18 Pa. C.S. § 4904), relating to unsworn falsification to

authorities.

No Notary
Required

*Roy Windom*
_____
(Signature of Defendant)

30
**Trial Court Attachment**

9

ORIGINAL

| COMMONWEALTH OF PENNSYLVANIA<br><br>VS<br><br>_Roy Windon. A_<br>(Name of Defendant) | IN THE CRIMINAL COURTS OF THE COUNTY OF<br><br>_____<br><br>Criminal<br>Action No._____ of _____ 2 _____ |
| --- | --- |

## ORDER

AND NOW this_____ day of _____ , 2 _____ Upon consideration of the foregoing motion:

1. ☐ The motion is returned to defendant for amendment as follows, such amendment to be made on or before

_____ , 2 _____

2. ☐ A rule is granted upon the Commonwealth of Pennsylvania to show cause why a hearing should not be granted. The

rule is returnable on or before _____ 2 _____

3. ☐ The request to proceed as a poor person, without the payment to costs, is        ☐ granted    ☐ denied.

4. ☐ Upon finding that defendant is unable to obtain a lawyer _____ Esq., is
appointed to represent him/her.

5. ☐ The Clerk of Court is ordered and directed to do the following forthwith:

(a) To serve a copy of this motion and this order upon the District Attorney of_____ County.

(b) To send a copy of this motion and this order to_____ Esq., the lawyer for the defendant.

(c) To send a copy of this order to the defendant.

6. ☐

31
**Trial Court Attachment**

These are two letters to confirm my earlist efforts to inform trial counsel of my desire to seek at some of the mentioned evidence, and to voice some of my concers over the evidence at the time. This pre dates the Dillion motion and my knawledge of CPS law, aswell as the finding of the phone, but I did give trial counsel access to my Facebook to identify conversations with Tonya Lyons

Other letters were hand written because of access to law library, but after every letter I called trial counsel to confirm whether or not he recieved these letters over the jail phone, letters he should still have with my case file.

Richard J. Giuliani                                          3/2/18
1717 Arch St-Suite 3640
Philadelphia PA 19103

Dear Mr. Giuliani

    I'm writing you to update you on the last letter I sent you and our conversation over the phone (where you asked me about the locations of the people in my letter)I am also writing you because I am concerned that my case may be looked at as only a hearsay based case that needs no real investigation. I can understand how a lot of these cases go because of the time frame and also the accusations there is no evidence to gather, but there are cases that I feel come off one way but underneath are lot different then what they seem. I'm attempting to have you understand in these letters yes this is a sad situation but I did not do what I'm being accused of in no way shape or form. Being that what this is was a marital dispute that turned into a custody dispute by two immature adults in which Doretta and I got caught in the middle of. I'm afraid that if my case is looked at as typical of its kind that I will be put at a definite disadvantage when we do get to trial. I feel the most obvious of the these things are the Chop visit on 8-25-14 which should be a eye sore to any investigator being that on 9-15-14 the allegation of penetration was denied(also I feel it should be of extremely important to both the prosecution and the defense). . There is a recurring scene I see played out over and over again here where people trials are scheduled and never see their lawyer until a few weeks or day before trial which can't work in my case.

    I want to begin by answering the question of the where about of Josiah and Veronica Summers? Josiah is currently in DHS custody (which was mentioned at the preliminary hearing). The last time me and my mother talked about it he was in foster care up until April of 2016 the last time we talked she told me that he was sent out Pittsburg to a Boys home because of his behavior and that she said she had limited to no contact with him (in all she said he didn't want to talk to her until he gets himself together Josiah would have only been 11 years old). To be honest as you should see in the text messages she has a lot to hide and she is sweeping a lot of the truth under the rug the thing is Josiah has to be attained because in the end with some of the information I gathered it could mean the difference between winning and losing. Veronica Summers on the other hand she is still a work in progress she is currently on my face book and I'm waiting for a response. Marquetta on the other hand she isn't a credible witness at the time she isn't responding to phone call or text messages and now her phone number no longer works. I needed her to come to testify to the composition of household and also the fact that she was told by Doretta that the reason she lied was because she had gotten caught sending my mom's boyfriend nude pictures which I believe why she was taken to PCA on 10-29-15. Also the composition of the household being she is the one who slept in the backroom.

    My approach in building a defense centers around the fact that Doretta was put up to the original allegation (being I know that I didn't do this and also what Doretta told me herself), is taking a deeper interest into the original allegations especially the reason for the CHOP visit and the obvious results being that it could make or break the case for either the prosecution or defense. And the many questions surrounding the original allegations especially the 9-15-14 visit by Trina Jenkins in which there was no explanation as to why Doretta didn't show up to her forensic interview (which she explains in her original forensic interview on 10-23-14 in which she says she wasn't going to lie, and also which could throw out the idea of her being coerced into making the statements once she came home). There are also a lot of questions I feel surrounding the situation when she came home because I was at work when her and Josiah came home meaning that I could only have known by being told by my mother. There are a lot of things to be looked into like I explained to you in the previous letter Doretta and Josiah went to

**33**
**Trial Court Attachment**

the school on Oct. 1, 2014 to report the abuse at the hand of my stepfather, later they were taken to a youth shelter until Trina Jenkins was called under the recommendation of CPS and the school they were suppose to go back to my mother but Trina took them back to my stepfathers instead the two main points I want to make when it comes to that is that first that as you should see in the discovery Trina didn't talk to my mom about the accusations until Oct 6,2014 when the kids came home but, it was my mom who originally reported the allegations meaning and also talked to Trina throughout that entire situation, but again the first time it seemed that they talked was on Oct 6. The obvious Oct, 2, 2014 visit by Trina in which she states that she went to see her about the allegations, which I know isn't true because I was there when the kids went to the school the day before and that she went up there because she was called by CPS in Dover. There is also the possibility that maybe Doretta said something to the school and also CPS about the allegations there was also a complaint about James too as well about his behavior and conduct around the school (in which I was told he wasn't allowed to come to the school anymore) which could add to character evidence when it comes to him.

There are a lot of moving parts in my case like I said in the previous letter Mr. Giuliani that again can be overlooked if my case is looked at as typical of its kind. When it comes to DHS there are a lot of things I see wrong with their investigation, also when it comes to my discovery I feel there are things missing, such as the interview that should have been conducted of MS miller the school official Doretta said she told because as you know she has a duty to report the accusation, and there is also the interview that should have been conducted of my mother because she was still talking and seeing Doretta after the accusation was made and she said in her original interview that I didn't do it and that Doretta was put up to the allegations by my stepfather. Being that Doretta turned and later said I did these thing in order for her to still be able to see Doretta after the fact means she would still have to had been asked about the original interview. There are also the many questions surrounding again the reason for the DHS visits like I said in the beginning of the letter and in my previous letter that my mother was the one who called about the accusation originally.

I'm pretty sure you familiar with Brady vs. Maryland and their rules on exculpatory evidence I feel things have been kept out from my discovery even by the prosecution or DHS (in which I believe DHS being a state ran and federally funded agency they would also fall under the Brady obligation), or there may be that there simply wasn't a investigation done into these things I feel with the new head DA Larry Krasner they'll be more willing to cooperate in giving over any exculpatory evidence they may have forgotten. I'm also including in this letter my personal notes that I've drafted I have the most confidence that we can but up a strong argument if the things I asked you for are looked into Mr. Giuliani and if we can acquire Josian as a witness then I feel we could see victory in the court room because in the hand written portion I'm including my reason for why she made the allegations again in 2015 I may be able to answer questions that most people can't answer in my type of case and maybe not just put up a strong argument but prove I didn't do what I'm being accused of and I have the up most faith in the fact that you will do what's best in my defense.

Sincerely
Roy Windom
3/2/2018

34
**Trial Court Attachment**

Richard J. Giuliani

1/12/18

1717 Arch St-suit3640
Philadelphia PA 19103

Original letter I sent Trial counsel

Dear Mr. Giuliani

I'm writing you concerning the progress of my case and a few issues that I have discovery. I'm aware that my trial is set to start June 5 2018, and that it is fast approaching. There are a lot of moving parts in this case that can be easily overlooked if my case is looked at as typical of its kind (mostly isolated and based mainly on hearsay). I'm writing you to clear up these issues.

My first issues lies with the 8-25-14 meeting between Doretta and Chastine Sparks at Chop hospital where the allegations were first mentioned. There isn't a clear explanation as to why my step-father brought Doretta to the hospital or the results, and I also know what I did and didn't do and what I'm being accused of I know I didn't do. And I also know what Doretta and Tonya told me as far as my Step-father putting her up to the allegations. So the visit and the result I feel could work in my favor especially when you take into consideration that there is no definite time line as to when the DHS worker seen Doretta (before or after the visit), and any medical records between 8-25-14 and 9-15-14 when you think that peretration was denied later I feel as though it's important that this issue is cleared up for the interest of my defense.

This leads me to the next issue concerning the 10-2-14 meeting between Doretta and Trina Jenkins I am well aware that on that day Josiah and Doretta made an attempt to get back to their mom form my step-fathers. In which Josiah went to the school he and Doretta attended in Dover to report the mistreatment and abuse at the hands

of my stepfather, and to also call my mother who at that time made repeated attempts to get them back from my step-father after the initial accusation (in which I explained that there was no one mentioned as the perpetrator). In which school officials contacted Dover CPS (who generated the original report with Josiah) and they came and took the kids to a youth shelter for the night until Trina Jenkins could come and take them back to my mothers under the recommendation of school officials and CPS for pass misconduct from my step-father. This interest me because the reason given in the discovery isn't correct and I was there for the end of the event where CPS and school official said they were filing formal complaints against Trina because Josiah and Doretta weren't suppose to be there in the first place with my stepfathers past history of abuse and criminal record. The reason I'm saying this is because they ran away four days later and in talking with CPS and school officials is it possible to see if Doretta mentioned anything about the allegations being she denied it when she came home.

Which brings me to my most important concern the ability to attain witnesses, I know we talked about Marquetta as a witness but she isn't the most reliable person and with her past history and criminal record she might end up being impeached. Josiah on the other hand is a unimpeachable witness he was there from the beginning before and after Delaware he was the reason for them coming back to Philadelphia the way they did and also he was there at the Chop visit because he had told me in a conversation we had about their doctors visit that they only came to one doctor's appointment and it was my stepfather who brought them. I feel with the controversy surrounding Doretta's testimony in the beginning and the thing she's saying now that Josiah can be a enviable asset to my defense, and it's imperative that we move quickly to at least attempt to attain a statement from him (even if it's something like the PCA process) before he is released to my mother

Custody because she has just as much to lose as I do as you will see in the text message feeds that I've had sent to you.

My next pressing issue is the DHS records; I only have one piece of paper from DHS pertaining to the case which is only used to inform Law enforcement of the accusations. I feel with DHS being the original reporting agency I should have their original reports. And also with Doretta saying so much the DHS records should contradict her testimony along with Josiah about the composition of the household especially with the discovery stating that my family has a long history with DHS. Also I have a issue with DHS because my mother made me aware in DEC of 2016 that there was a DHS worker named Tamika Orr on my face book who at the time was the kids current worker (which you will also learn from the text feeds I'm sending you).

Ms. Orr posted news articles that DHS was under investigation for forging documents not doing house visits and falsifying reports especially home visits. And the fact the my mother was the original source of the allegations in which I told you my stepfather only told her that Doretta was molested but not mentioning the perpetrator. Also the fact that she was told by the DHS worker the allegations were false and that nothing physically was wrong with Doretta. I feel the DHS records should be a part of my discovery and also the even on 9-15-14 where Doretta didn't show for a forensic interview scheduled in which Trina claims she still made the accusations but didn't clarify why Doretta didn't show up to her interview or why she wasn't rescheduled for another one. also the fact the my mom couldn't get in contact with Trina for a few days after the allegations were originally made and my mom had to contact the DHS supervisor who I believe is Chestline Sparks being that Trina was the one who reported back to my mom about the allegations.

These are the main issues that I have especially a priority to the acquiring Josiah as a witness. I've mentioned various times throughout this letter that I'm sending your text messages feeds what I'm attempting to find in these messages are the reason for the second accusation, and also supporting messages to show that I didn't know of the second accusation and that the only person who could have informed me was my mother who I talked to before and after the accusations were made. You'll be receiving them from three different sources a text app and my mom's phone numbers new and old which should go back to 2014 or 2015 I'm doing my best on my end to give you the best chance of advocating for me before the court. Also I'm working on another witness Veronica summers who was there in that summer helping my mom to get the kids back. Also I'm giving you my face book Roywindom@gmail.com password: ██████████ capital S also when you get the messages I know it will take some time (because it is a lot) but can you send me copies so I can make sure it's accurate and everything and I also know what to look for.

Sincerely
Roy Windom

Koy Windom
Inmate # QA9432
8cI Huntingdon
1100 Pike ST
Huntingdon PA
16654-1112

Active Criminal Records
Administrative Office

MAY 24 2021

RECEIVED

CJC Clerk Of Coorts
1301 Filbert ST
Phila, PA 19107

Received
MAY 11 2021
Office of Judicial Records

Legal Mail